UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:                                                         :
                                                               :
18TH AVENUE REALTY, INC.,                           :    Chapter 11
                                                               :    Case No. 03-14480(RDD)
                        Debtor.                                :
----------------------------------------------------------------x
                                                               :
KENNETH P. SILVERVAN, ESQ., the Chapter                        :
11 Trustee of the Estate of 18th Avenue Realty, Inc.,:
                                                               :
                        Plaintiff,                             :    Adv. Pro. No. 07-01717(RDD)
                                                               :
              -against-                                        :
                                                               :
CENTRAL EQUITIES CREDIT CORP.,                                 :
ZALMAN KLEIN, HENRY GUTMAN,                                    :
YAFFA GUTMAN, ARYEH GUTMAN                                     :
and ABRAHAM SINGER,                                            :
                                                               :
                        Defendants,                            :
----------------------------------------------------------------x

### MEMORANDUM OF DECISION ON CENTRAL EQUITIES
### CREDIT CORP.'S POSTPETITION INTEREST CLAIM

Appearances:   Lebensfeld Borker Sussman & Sharon, LLP, by Alan M. Lebensfeld, Esq.,
               For Central Equities Credit Corp.

               LaMonica Herbst & Maniscalco, LLP, by Gary F. Herbst, Esq., for Henry
               and Yaffa Gutman

Hon. Robert D. Drain, United States Bankruptcy Judge

    This dispute, like this chapter 11 case, stems from a falling out between

two brothers, Aryeh Gutman ("Aryeh") and Henry Gutman ("Henry").  As much as the

Court had wanted these men, who also shared an office for decades, to settle their

differences, they have not completely (although apparently they have settled at least some

of them).  This Memorandum of Decision therefore states the Court's basis for

1

determining the last issue in this chapter 11 case, which resolves the allocation of the remaining funds available for creditors and shareholders of the above debtor (the "Debtor") in the context of cross motions for summary judgment by (a) Henry and his wife Yaffa and (b) Central Equities Credit Corp. ("Central").[1]

At issue is the rate upon which to calculate Central's allowed claim for postpetition interest under the terms of the confirmed and substantially consummated chapter 11 plan in this case for a period after the plan's effective date. In all other respects, including Central's claim for postpetition, pre-effective date interest, Central's claim is now undisputed and paid.

## Jurisdiction

This Court has jurisdiction over the motions for summary judgment, which arise under section 502 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., under 28 U.S.C. §§ 1334(b) and 157(a) and the provisions of the Debtor's confirmed chapter 11 plan and the confirmation order that reserved such jurisdiction. Plan ¶ 15.01(a); Confirmation Order ¶ 16(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## Facts

The following facts are undisputed or matters of which the Court can take judicial notice. The Debtor owned land in Brooklyn, New York. When the Debtor filed its chapter 11 petition on July 15, 2003, actual managerial control was in Aryeh's hands; however, on December 10, 2003 the Court ordered the appointment of a chapter 11

---

[1] Central apparently is owned or controlled at least 87.5 percent by Aryeh; Henry owns at most only 12.5 percent of Central. On the other hand, Henry owns 50 percent of the Debtor, the other 50 percent being owned by Aryeh. Thus, Henry will receive 50 percent of every dollar not used to pay Central's claim and instead going to the Debtor's shareholders, whereas Henry would receive at most only a 12.5 percent indirect benefit, net of any claims against Central, from every dollar of allowed claim paid to Central (the plan providing that the Debtor's shareholders are entitled to the surplus after the payment of all allowed claims and administrative expenses and Central's claim being the last to be paid).

2

trustee, and on December 12, 2003 the United States Trustee appointed Kenneth M. Silverman as the chapter 11 trustee in this case (the "Trustee").  The Trustee successfully marketed and sold the Debtor's real property for $8 million and by order dated February 16, 2007 obtained confirmation of the Trustee's First Amended Plan of Reorganization, dated December 11, 2006.  That plan was modified before its substantial consummation by order dated September 14, 2007 (the "Plan Modification Order"; the chapter 11 plan, as so modified, the "Plan").

The Plan was a liquidating "pot" plan, providing for the distribution of the $8 million sale proceeds and any other proceeds of the Debtor's estate, net of ordinary course expenses, to holders of allowed secured claims, administrative expenses, priority claims and general unsecured claims in the order of their priority, with any surplus to be distributed to the Debtor (at that point merely a shell) for subsequent distribution to the Debtor's shareholders.[2]  Given the aggregate amount of allowed claims against the Debtor's estate and the Trustee's estimate of the likely allowed amount of disputed claims, it was clear that the shareholders would eventually receive a substantial distribution.  See First Amended Disclosure Statement in Respect to the Chapter 11 Trustee's First Amended Plan of Reorganization Dated December 11, 2006 (the "Disclosure Statement") at 15, in which the Trustee estimated that the total allowed amount of claims, including administrative expenses, would not exceed $3,417,000.

During the time that the Plan was proposed and confirmed, and thereafter, there was one substantial claim dispute.  Both Central and an individual named Zalman Klein ("Klein") had filed proofs of claim that the Trustee believed were mutually

---

[2] After a trial involving five different potential combinations of ownership interests, the Court had previously determined, by order dated February 10, 2006, that the Debtor was owned 50 percent by Aryeh and 50 percent by Henry.

3

exclusive. Id. at 14. Central's claim was for money loaned to the Debtor in the outstanding sum of $1,240,000, plus interest at an annual contract rate of 15 percent; Klein's claim was based on the theory that the money ostensibly loaned by Central to the Debtor was really money stolen with the Debtor's knowledge from an entity in which Klein had an ownership interest. Id. at 13-15.

The Debtor objected to Klein's claim on December 4, 2003. Klein objected to Central's claim on January 16, 2004. The litigation of the claim dispute had lain dormant, however, while the Court was determining who actually owned the Debtor and pending the completion of the Trustee's sale process and Plan confirmation. Thus, when the Plan was confirmed, the Trustee had not joined in either of the claim objections or filed his own, although, as noted above, in the Disclosure Statement the Trustee had stated his view that the claims were mutually exclusive and were subject to dispute.

The outcome of the present issue hinges on the provisions of the Plan that address disputed claims and distributions thereon after their eventual allowance, and, in particular, how such provisions relate to the resolution of Central's right to postpetition interest.

Plan ¶ 4.03 states,

> Allowed Class 3 Claims[3] will be paid in full, inclusive of any contract . . . interest accrued through the date immediately preceding the Filing Date, if any, <u>plus postpetition interes</u>t from the Filing Date <u>through the Distribution Date at the applicable contract . . . rate such that the claim will not be impaired within the meaning of Section 1124 of the Bankruptcy Code</u>. . . . The claim shall be paid in cash, as soon as practicable after the Effective Date, but in no event later than (i) thirty (30) days after the Effective Date and (ii) ten (10) days after the date such Unsecured Claim becomes an Allowed Unsecured Claim."

(Emphasis added.)

---

[3] Class 3 consists of general unsecured claims such as Central's.

4

Plan ¶ 1.20 defines "Distribution Date" as "any date on which a Distribution under the Plan is to be made to the holders of Allowed Claims." Plan ¶ 1.18 defines "Distribution" as "any payment by the Post-Confirmation Trustee to a holder of an Allowed Claim on account of such Allowed Claim from the Distribution Fund, which shall be a payment in full settlement, release and discharge of all rights of the holder of such claim, unless otherwise specifically set forth herein."

Article XI of the Plan deals with disputed claims. It provides in relevant part:

> 11.01 <u>Except as otherwise expressly provided in Article IV above, in the event that an objection to a Claim . . . shall be filed by the Trustee,</u> and any such objection is unresolved as of the date of the confirmation of the Plan, <u>the Trustee shall reserve in the Debtor's estate a sum not less than the amount required to pay the Disputed Claim under the Plan if said Claim was proved and allowed in full (with interest, if applicable), and deposit that amount in a reserve fund (the "Reserve Fund")</u> which shall be maintained by the Post-Confirmation Trustee in a separate bank account of the Post-Confirmation Trustee's choice. . . . <u>Disputed Claims that are litigated to judgment, settled or withdrawn shall be satisfied from the Reserve Fund. . . . Interest shall ultimately be paid to the extent accrued in the Reserve Fund</u>, in the amount of such Claim, which ultimately is Allowed.

(Emphasis added).

The September 14, 2007 Plan Modification Order amended Plan ¶ 14.01 to state, in relevant part,

> After the Post-Confirmation Trustee has reserved for all Disputed Claims as provided for in Article XI of this Plan, <u>including projected alleged interest calculated through and including December 31, 2007</u> and such other amounts as determined in the Post-Confirmation Trustee's sole discretion, and all non-Disputed Claims have been paid as Allowed Claims, the Post-Confirmation Trustee may determine, in his sole discretion that a Surplus exists. If the Post-Confirmation Trustee determines that a Surplus exists, the Post-Confirmation Trustee has the

5

>  right but not the obligation to pay each Interest Holder their respective pro rata share of any Surplus. . . .

(Emphasis added.)

The Central/Klein claim dispute had a somewhat convoluted history after the Plan's confirmation. When the Plan went effective on March 19, 2007 (the "Effective Date") and the Trustee, in his new capacity as post-confirmation trustee and distribution agent, became responsible for making distributions under it, he was not in a position, because of the pending Central/Klein claim dispute, to pay either of the claims. Not desiring to spend the estate's money litigating objections to Central's and Klein's claims when Central and Klein were prepared to do so themselves, on June 1, 2007 the Trustee commenced an adversary proceeding against Central, Klein, and Henry and Yaffa, seeking to interplead, under Fed. R. Bankr. P. 7022, $3,000120.53 as the sole source of payment of Central's, Klein's and/or Henry and Yaffa's claim[4] against the Debtor once any such claim was allowed. See Trustee's Complaint for Interpleader and Declaratory Relief, dated June 1, 2007 (the "Interpleader") at ¶ 49:

> The Trustee stands neutral as to the validity of the Klein Claim, the [Henry and Yaffa] Claim and the [Central] Claim as against the Debtor or any third party, and seeks to be discharged from all obligations as a stakeholder in that portion of the Debtor's Cash equal to the Interpleader Deposit, with the Debtor also being discharged from all liabilities on the Klein Claim, the [Central] Claim, and the [Henry and Yaffa] Claim, and with such claims to attach to and be compensable, if allowed, solely out of the Interpleader Deposit.

---

[4] Henry and Yaffa were named in the Interpleader complaint because they had filed a proof of claim that arguably asserted an ownership interest in Central's claim. However, the Court subsequently found that this interest was only indirect, through Henry's asserted ownership interest in Central. The Court therefore determined on June 4, 2008 that Henry and Yaffa had no standing in the Interpleader proceeding except to object to the amount of Central and Klein's claims and (because Henry and Yaffa had not objected to the Plan, which clearly established Central's right to pre-Effective Date postpetition interest at the 15 percent contract rate and was now res judicata) could object only to the interest portion of Central's claim constituting a claim for postpetition interest accruing after the Plan's Effective Date.

6

During oral argument on July 12, 2007 regarding the proper court to hear the Central/Klein dispute, Central made its position clear that the commencement of the Interpleader proceeding did not cut off its right under the Plan to the continuing accrual of postpetition interest at the 15 percent contract rate. The Trustee then filed an objection to Central's claim, as well as Klein's, on September 10, 2007.

Having reached the conclusion, however, that he did not have a basis to object to Central's claim, with the possible exception of whether Central had a right to postpetition interest at the 15 percent contract rate through the payment of a distribution thereon to Central (but still not wanting to make a distribution to Central in the face of Klein's and Henry and Yaffa's competing claims), the Trustee amended his Interpleader complaint on February 14, 2008 to add Aryeh and a relative of Aryeh, Abraham Singer, as defendants[5] and renewed[6] his request to be relieved of any further responsibility with respect to the disputed claims. After an April 14, 2008 hearing, the Court granted the Trustee's request, by order dated May 5, 2008 (the "<u>Interpleader Order</u>").

Under the Interpleader Order, the Trustee was authorized to deposit $3,162,169.84 into the Court registry under Fed. R. Bankr. P. 7067. That sum equaled the principal amount of Central's claim plus interest at the 15 percent annual contract rate through April 14, 2008. The Interpleader Order further provided that such deposit "shall be deemed a 'Distribution' under the Plan." However, the Interpleader Order also provided that the making of such deposit "cannot and shall not be construed as a determination as to whether an earlier date is appropriate or warranted concerning the cut-off of contract or statutory interest on account of the [Central] Claim, the Klein Claim

---

[5] Aryeh and Mr. Singer were dismissed from the Interpleader complaint by order entered April 23, 2008.
[6] The Trustee had not previously actively pursued the Interpleader action.

7

and the [Henry and Yaffa] Claim, and the rights and defenses of the parties to [Interpleader] Proceeding are hereby preserved."

As noted above, On June 8, 2008, the Court found that Henry and Yaffa had no independent claim to the Interpleader fund, although they did have the right to pursue the current claim dispute with Central. On December 8, 2008, Klein and Central entered into a stipulation, which the Court "so ordered" on December 19, 2008, pursuant to which Klein agreed, among other things, that he, too, had no interest in the Interpleader fund and waived any claim against the Debtor's estate. The Court's order approving the stipulation recognized that the funds would not be released to Central, however, except upon further order of the Court or the remaining parties' consent.

By consent order dated January 22, 2009, $3,069,934.22 was subsequently released from the Interpleader fund, consisting of (a) $2,977,698.60, representing the amount all parties agreed comprises Central's allowed claim (including 15 percent contract rate interest through April 18, 2007), and (b) $92,235.62, representing 50 percent of the remaining money in the Interpleader fund that would go to Aryeh in any event. Henry and Central's present motions dispute whether Central is entitled to the remaining amount in the fund.

## **Discussion**

Summary judgment is granted under Fed. R. Civ. P. 56, made applicable in this case by Fed. R. Bankr. P. 7056, when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment on the basis of a material factual dispute, there must be evidence on which a jury could reasonably find for

the non-moving party; although the evidence need not be probative, there must be a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986). Conclusory statements by the non-moving party do not suffice. Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990). There must be more than some "metaphysical doubt as to the material facts." Matsushita v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

As noted above, the determination of the issue presently before the Court depends on the terms of the Plan, which establishes the extent of Central's right to be paid postpetition interest. It is clear that "[t]he terms of a confirmed Chapter 11 reorganization plan bind each and every creditor, regardless of whether the plan impairs the creditor's claim, and regardless of whether the creditor accepted the plan." Bel Air Tollgate Pshp v. Bel Air Square Joint Venture (In re Bel Air Square Joint Venture), 1996 U.S. App. LEXIS 2478, *4 (2d Cir. Jan. 16, 1996); see also 11 U.S.C. § 1141(a). "Furthermore, the confirmation order serves as res judicata as to any issues that were or could have been raised in the confirmation proceedings." In re Bel Air Square Joint Venture, 1996 U.S. App. LEXIS 2478, *4.

Thus, it is commonly recognized that a confirmed plan is, in essence, "a legally binding agreement." In re Montgomery Ward Hldg. Corp., 306 B.R. 489, 495 (Bankr. D. Del. 2004). See also In re Pettibone Corp., 134 B.R. 349, 351-52 (Bankr. N.D. Ill. 1991) ("A plan of reorganization is a contract which binds a debtor and its creditors."); Fed. Land Bank of Jackson Miss. v. Herron (In re Herron), 60 B.R. 82, 84 (Bankr. W.D. La. 1986) ("Once a plan is confirmed, the preconfirmation debt is 'replaced' with a new indebtedness as provided in the confirmed plan. The new

9

indebtedness is in essence a new and binding contract between the debtor and the creditors."). In construing a confirmed chapter 11 plan, then, the Court should apply contract principles. In re Shenango Group Inc., 501 F.3d 338, 344 (3d Cir. 2007)

A dispute over the meaning of a chapter 11 plan thus is particularly apt for resolution by summary judgment, being a question of law if the terms of the plan are unambiguous. Id. at 346; Goldman, Sachs & Co. v. Esso Virgin Is., Inc. (In re The Duplan Corp.), 212 F.3d 144, 151 (2d Cir. 2000) (proper standard for appellate review of a pure textual construction of chapter 11 plan and related confirmation order is de novo, as a question of law). See also Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989); Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (under New York law, "if a contract is unambiguous on its face, its proper construction is a question of law").

Having determined to apply contract interpretation principles to the Plan, one turns to the law of the State of New York -- where the Plan was negotiated and confirmed and which contains a New York choice of law provision (Plan ¶ 17.01) -- for such principles. They are well established. Under New York law, "a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir. 1992), citing Breed v. Ins. Co. of North Am., 46 N.Y.2d 351, 355 (1978); see also Beth Medrash Eeyun Hatalmud v. Spellings, 505 F.3d 139, 146 (2d Cir. 2007) ("[T]he best evidence of intent is the contract itself; if an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms.").

10

"Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." Metropolitan Life, 906 F.2d at 889. Rather, contractual provisions are ambiguous only if they are objectively susceptible without reference outside the contract to more than one interpretation by a reasonably intelligent person. Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 139 (2d Cir. 2000); Burger King v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990). Conversely, "[c]ontract language is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Metropolitan Life, 906 F.2d at 889 (internal quotation and citation omitted); see also LTV Corp. v. AM Gen. Corp. (In re Chateaugay Corp.), 154 B.R. 843, 847 (Bankr. S.D.N.Y. 1993).

Relatedly, "a contract should be construed so as to give full meaning and effect to all of its provisions." PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) (quoting American Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), appeal denied, 77 N.Y.2d 807 (1991)). Or, stated in the negative, no provision of a contract should be left without force and effect. Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2002); Laba v. Carey, 29 N.Y.2d 302, 308 (1971); Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (1957); see also Homemaker Indus., Inc. v. Official Comm. of Unsecured Creditors of HMKR, Inc., 2004 U.S. Dist. LEXIS 6682, at *15 (S.D.N.Y. Apr. 20. 2004); Restatement (Second) of Contracts § 202(2). Relatedly, too, although the Court should construe every provision of a contract in light of its context within the contract as a whole, a specific provision should govern over a general provision to the extent it applies to the facts at issue. Paneccasio v.

11

Unisource Worldwide, Inc., 532 F.3d 101, 111 (2d Cir. 2008); Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d at 46; see also Restatement (Second) of Contracts § 203(c).

Here, Central asserts that under Plan ¶ 4.03 it is entitled to its contract rate of postpetition interest through the "Distribution Date," which it interprets under Plan ¶¶ 1.18 and 1.20 to mean the date that Central actually receives a payment on its allowed claim, regardless whether the payment was delayed by resolution of the objection to its claim. It acknowledges, however, that the May 5, 2008 Interpleader Order deemed the Trustee's deposit of the Interpleader fund into the Court registry a "Distribution," or payment, under the Plan; therefore, Central contends that it is entitled to postpetition interest at the 15 percent contract rate through May 27, 2008, the date that the Interpleader fund actually was deposited in the Court registry and was deemed a payment to Central.

Henry contends, to the contrary, that because Plan ¶ 1.20 defines "Distribution Date" as "any date on which a Distribution, or payment under the Plan is to be made" (emphasis added), it was intended to signify a hypothetical or precatory date; that is, that it is not the date on which a payment to the particular claimant is actually made, but, rather, it is the date that a payment should be made (or perhaps was made to another similarly situated claimant). Henry therefore contends that Central's right to postpetition interest at the contract rate was cut off on the date by which the Trustee was required under the Plan to make the first payment to creditors on their allowed claims, whether or not the payment was made. According to Henry, it does not matter that a distribution was deemed made to Central only months later. Because payment of undisputed, allowed claims was required to be made under Plan ¶ 4.03 no later than thirty

12

days after the Plan's March 19, 2007 Effective Date, Henry thus contends that Central's right to contract rate postpetition interest was cut off on April 18, 2007.

There are three problems with Henry's argument.

First, based upon the plain language of Plan ¶¶ 1.18 and 1.20, it appears clear that the Plan uses the terms "Distribution" and "Distribution Date" to refer to each actual payment under the Plan and the dates of such payments, respectively, and that the reference to "Distribution Date" in Plan ¶ 4.03 therefore refers to the date of a payment on each allowed claim, <u>not</u> simply the date that the first distribution on an allowed claim was supposed to be made or might have been made. Admittedly this interpretation is based on the Court's experience reading the same or similar definitions in hundreds of chapter 11 plans, but it is reasonable to assume that these parties would have had a similar interpretation.

In any event, it is highly unlikely that the Court would have approved confirmation of the Plan if Henry's contrary interpretation could have been applied to these provisions. That is because Henry's interpretation does not comport with the meaning of the term "Distribution Date" when read in the full context of Plan ¶ 4.03, the plain terms of which require that the claimant receive postpetition interest "such that the claim will not be impaired within the meaning of Section 1124 of the Bankruptcy Code." Under Henry's interpretation, if the Trustee made a payment on account of some allowed claims between the Plan's Effective Date and thirty days after the Plan's Effective Date, (or even failed to make any payment during such period), delaying payments on at least some allowed claims, the unpaid allowed claims would not have been "unimpaired" under section 1124 of the Bankruptcy Code if later paid without the subsequently accrued

13

postpetition interest. They would have been deprived of interest which they had a right to be paid. 11 U.S.C. §1124.

Finally, if Henry's interpretation applied, there would be no reason for Plan ¶ 11.01 to provide for a separate treatment of postpetition interest for disputed claims covered by the disputed claims reserve mechanism -- that is, for payment of interest only as earned on the sum, including interest accrued to that date, deposited in the reserve account. Such interest would, instead, already have been cut off.

Doe Plan ¶ 11.01 -- which, in light of the fact that the Trustee could not predict the Distribution Date on disputed claims, understandably limits the holders of disputed claims to postpetition interest actually accrued on the reserve fund for such claims, after the establishment of such reserve -- mean, however, that Central's argument also is flawed, because Central's claim was disputed and therefore the provisions of the Plan specifically dealing with disputed claims should govern over the more general distribution provision of Plan ¶ 4.03? By its plain terms, Plan ¶ 11.01 applies, though, only "in the event that an objection to [the] Claim . . . shall be <u>filed by the Trustee</u>." (Emphasis added.) Klein's objection to Central's claim, therefore, did not suffice to trigger Plan ¶ 11.01. The Trustee's September 10, 2007 objection to Central's claim would, however, appear to suffice, cutting off Central's right to postpetition interest upon the filing of such objection, which took Central into the disputed claims reserve mechanism of Plan ¶ 11.01. (Henry argues that the Trustee's commencement of the Interpleader proceeding on June 1, 2007 also would suffice, but it was not the same thing as a claim objection, required by the plain terms of ¶ 11.01.)

14

Central makes two arguments worth considering in response.[7] The first is that because Plan ¶ 11.01 begins with the clause "Except as otherwise expressly provided in Article IV above," Plan ¶ 4.03's postpetition interest provisions cannot be modified by ¶ 11.01. The problem with this argument, however, is that it, too, would render Plan ¶ 11.01 superfluous, because it would logically exempt all disputed claims, since all three classes of claims under the Plan are dealt with in Plan Article IV, from the reach of the Plan's provision for the establishment of a reserve for disputed claims in ¶ 11.01. Instead, the introductory clause to ¶ 11.01 is properly read to apply to the unique rights of holders of secured claims, dealt with in Plan ¶ 4.01 and not specifically to anything uniquely and expressly provided for with respect to disputed claims in Plan ¶ 4.03. Again, it is too much to expect the establishment of a reserve that would guaranty 15 percent interest on a disputed claim when, as here, the date that the claim dispute would be resolved could not be predicted.

Central's second argument against cutting off its interest claim as of September 10, 2007, the Date of the Trustee's claim objection (an argument, of course, that Central makes only as a fall back from its primary argument that it is entitled to contract interest through the date of the May 27, 2008 deemed Distribution into the Interpleader fund), is valid, however. Under the Plan Modification Order, which was entered on September 14, 2007, only four days after the Trustee filed his objection to Central's claim, the Plan was modified to add ¶ 14.01, which permitted the Trustee to

---

[7] The other arguments by Central, that the Trustee never actually established a reserve account and that the Trustee's efforts to resolve this issue by means of stipulations and orders establishing separate reserve funds indicates that the Trustee did not believe Plan ¶ 11.01 applied to Central, are clearly unavailing. The Trustee has always separately accounted for the amount withheld from Central because of the claim dispute, which has been invested in an interest bearing account under the Trustee's control until the creation of the Interpleader fund. Henry and Yaff also should not be disadvantaged by the Trustee's efforts to settle Central's postpetition interest claim, Central having taken the position that the Trustee's objection to its claim did not cut off the accrual of its contract rate interest. Efforts to settle do not equate to a waiver.

15

make a distribution of surplus to the shareholders only after the Trustee had "reserved for all Disputed Claims as provided for in Article XI of this Plan, <u>including projected alleged interest calculated through and including December 31, 2007</u>."  (Emphasis added.)  It is true that this provision does not expressly amend Plan ¶ 11.01; however, it effectively does so, providing for a deposit into the reserve of <u>projected</u> interest through December 31, 2007.  Once in the reserve, that sum is, under Plan ¶ 11.01, available to pay Central's allowed claim.[8]  (This Plan modification, which specifically contemplates a limited amount of projected contract rate interest, also independently cuts off Central's right to contract rate interest after December 31, 2007, even if, for some reason, Plan ¶ 11.01 did not apply to Central's claim.)

## **Conclusion**

For the foregoing reasons both summary judgment motions are granted in part and denied in part.  Central shall have an allowed claim for postpetition interest at its 15 percent contract rate through December 31, 2007.  It shall be paid from the remaining money in the Interpleader fund an amount equal to its 15 percent per annum contract rate interest from April 19, 2007 through December 31, 2007, plus any interest actually earned on such amount in the fund.  The remaining amount in the Interpleader fund shall

---

[8] Henry also argues that Central should be held to an earlier interest cutoff date based on Central's counsel's undisputed agreement in principle in April 2007 to a proposed interim resolution of the Central/Klein claim dispute, which, like the ultimately entered Interpleader Order, would have provided for a payment into a reserve fund that effectively could have cut off the accrual of interest after a certain period.  See Affidavit of Robert D. Nosek, Esq., attached as Exhibit F to Henry's summary judgment motion (the "<u>Nosek Aff.</u>").  However, notwithstanding the agreement in principle to such a concept, it is not alleged that the parties agreed, even in principle, on the actual date for the payment into the reserve fund, whether that would have constituted a "Distribution" (as ultimately provided for in the Interpleader Order) that would clearly cut off Central's claim to contract rate interest, or whether the reserve amount would include a projected amount of contract rate interest and, if so, what amount (compare the first and second sentences of Nosek Aff. ¶ 3) -- all clearly material terms over which the lack of a consensus renders the alleged agreement unenforceable.

constitute Surplus under the Plan and be paid as provided in the Plan and the Court's prior orders.

Counsel for Central shall settle an order consistent with this Memorandum of Decision on counsel for Henry and Yaffa on seven days' notice. Such order shall set forth the specific dollar amount to be paid from the Interpleader fund to Central. To the extent necessary, the Clerk of the Court shall provide counsel to Central with the rate of interest at which the Interpleader fund has been invested.

Dated: White Plains, New York
      May 7, 2010

                                    /s/Robert D. Drain
                                    United States Bankruptcy Judge